AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Arkansas ▾

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
3447 County Road 3201, Clarksville, Arkansas
72830

)
)
)
)
)
)

Case No. 2:22 CM 43

**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

May 4, 2022

OFFICE OF THE CLERK

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Western_____ District of _____Arkansas, Fort Smith Div.____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Controlled Substance Offenses |
| 21 U.S.C. 846 | Conspiracy |
| 18 U.S.C. 1956 & 1957 | Money Laundering |

The application is based on these facts:
See Attached Affidavit of DEA SA Andrew Chronister.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ANDREW CHRONISTER  Digitally signed by ANDREW CHRONISTER
Date: 2022.05.04 09:44:53 -05'00'

*Applicant's signature*

DEA SA Andrew Chronister
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/4/22

City and state: Fort Smith, Arkansas

*Judge's signature*

Hon. Mark E. Ford, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A – LOCATION TO BE SEARCHED

Subject Premises: The location to be searched is 3447 County Road 3201 Clarksville, Arkansas 72830.  The Subject Premises is located in the Western District of Arkansas and has a mailing address of 3447 County Road 3201, Arkansas.  The Subject Premises are two mobile homes sitting on 17.73 acres with several outbuildings surrounded by vehicles and other farm equipment.

The buildings for the Subject Premises are depicted in the following photograph overhead picture. The Subject premises are labeled as "Wood, Joel or Malina":



## ATTACHMENT "B"

### ITEMS TO BE SEARCHED FOR, SEIZED, AND SEARCHED

Definitions: The terms "records," "documents," and "materials" include all of the following items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly or indirectly), any photographic form (such as microfilm, microfiche, prints, photocopies, electronically stored images), any mechanical form (such as information on an electronic, or magnetic storage device, such as floppy diskettes, backup tapes, CD-ROMs, optical discs, or smart cards, as well as printouts or readouts from any magnetic storage device). The term "records" shall include the content of electronic communications in electronic storage within the meaning of 18 U.S.C. § 2703(a).

1. Controlled substances and objects and containers such as packaging, scales, and related paraphernalia used in the manufacturing, distribution, concealment, sale, use and/or transport of methamphetamine.

2. Cash, currency, and records related to income and expenditures of money and wealth concerning controlled substances, including but not limited to: money orders, wire transfers, credit card records, cashier checks, receipts, bank statements, passbooks, checkbooks, check registers, and safe deposit box keys;

3. Books, records, papers, receipts, documents, notations, diaries, journals, or ledgers, showing the receipt, storage, obtaining, manufacturing, use of items used in the commission of criminal activities as described above, and notes of computer passwords, codes, or any other security information or device, in whatever media found;

4. Receipts, invoices, titles, deeds, and any other documents, which is evidence of expenditures and/or are evidence of items purchased in the commission of criminal activities as described in paragraph 1 above;

5. Travel records and receipts, bank safe deposit records storage facility records, ledgers, correspondence, telephone books, telephone records, including any records, documents, address books, photographs, and other documents, tending to establish the identity of associates, customers, suppliers, manufacturers of individuals who are engaging in the criminal activities as described in paragraph 1 above;

6. Books, records, papers, receipts, documents, notations, diaries, journals, or ledgers, showing receipt, expenditure or availability of substantial amounts of currency, cash, or money;

7. Bank statements, account information in regards to, but not limited to, money market accounts, savings accounts, checking accounts, retirement accounts, deposit slips, withdrawal slips, and canceled checks for and all bank accounts, including certificates of deposit and money market accounts;

8.      Credit card receipts and credit card statements and charge account information;

9.      Photographs depicting assets, firearms, illegal behavior, travel, and/or expenditures;

10.     Electronically stored records showing proof of residence, proof of storage unit use and/or rentals, additional properties owned or documents reflecting straw purchases, real estate transaction documents, rental agreements or documents, as well as automotive sale or purchase or financing documents;

11.     Documents purporting to indicate income or salaries received reflecting employment, hours worked, wages earned, withholdings, W-2 and W-4 forms, (blank or executed), state and federal tax returns or documents pertaining to the preparation thereof;

12.     Records showing secret clientele lists, business associates, diversification of wealth, United States Currency, and firearms related transactions;

13.     Any other electronically or otherwise stored tangible items evidencing the obtaining, transfer, secreting, and/or concealment of assets and/or money;

14.     Records, documents, receipts, and/or negotiable instruments which evidence the purchase of negotiable instruments and/or the structuring of currency transactions to avoid the filing of currency transactions reports and/or the laundering of monetary instruments;

15.     All electronically stored books, records, papers, receipts, ledgers, and journals, or other tangible evidence, recording income, expenditures, assets, and liabilities;

16.     Documents evidencing fruits, instrumentalities, monies, records, and notations, associated with the crimes as described in paragraph 1 above;

17.     Computer Hardware consisting of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Hardware includes any data processing devices (including but not limited to central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, scanners, digital cameras, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks);

18.     Uploaded Computer Software such as digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities;

19.    Items which can also be stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, or removable     hard disk cartridges, software or memory in any form, including portable storage media, more particularly described as follows:

      a.    Any and all computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

      b.    Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort     of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software digital code     may include a programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well a reverse the progress to restore it.

21.    The phone numbers and/or direct connect and/or names and identities, including electronic mail addresses, usernames and passwords assigned to the cellular telephone devices and computers mentioned above.

22.    Cellular telephones, tablets and portable devices including information stored within the devices including but not limited to: digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities, including electronic mail addresses, usernames and passwords stored in the above listed cellular telephone devices and computers and in any other electronic media attached to or found with the devices, including but not limited to SIM cards and flash memory cards.

23.    Phone numbers, direct connect numbers, electronic mail addresses contained within the cellular telephone devices and computers listed above. Internet Protocol addresses and other accounts dialed or accessed using the device or otherwise communicating with or accessing the above listed items.

24.    Photographs, text messages, electronic mail messages and any other documents or information stored in the memory of the above listed items relating to violations of Title 21 USC § 846 and § 841 and Title 18 USC § 1956 & 1957.

      25.    Firearms used to protect illegal controlled substance and/or proceeds from the sale of illegal controlled substances.

      26.    Joel Keith Wood.

      27.    Ryan Keith Wood

## Affidavit In Support Of Search Warrant

I, Andrew D. Chronister, Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION

1. I submit this affidavit in support of an application for a search warrant for 3447 County Road 3201, Johnson County, Clarksville, Arkansas (the "**Subject Premises**" or "**Subject Property**"), a residence located in the Western District of Arkansas, Fort Smith Division, and further described in **Attachment A**. The application seeks a warrant to search for and seize the items described in **Attachment B**. I believe there is probable cause to believe that now concealed within the **Subject Premises** is certain property, information, and data, described in **Attachment B**, which constitutes evidence of a crime, contraband, fruits of crime, items illegally possessed, and property designed for use, intended for use, or used in committing a crime constitute evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Sections 1956 and 1957. **Attachment A** and **Attachment B** are incorporated herein by this reference.

## AGENT BACKGROUND

2. I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3. Affiant is employed with the Drug Enforcement Administration (DEA), and has been employed in this capacity since April 2018. I am currently assigned as a Special Agent to the

Fort Smith Post of Duty Office in Fort Smith, Arkansas. Before being employed with the DEA, I was employed by the Kansas City, Kansas Police Department from December 2012, to April of 2018.

4.      During my law enforcement career, I have participated in investigations of narcotics trafficking, money laundering, complex conspiracies, and, among other things, have conducted or participated in surveillances, the execution of search warrants, and debriefings of informants. Through my training, education, and experience, I have become familiar with the manner in which narcotics traffickers and money launderers conduct their operations, including but not limited to, their methods of importing and distributing controlled substances, their use of cellular telephones (including using multiple phones at once to communicate with different members of a drug organization, and the frequent use of new/replacement phones), their use of counter surveillance techniques, and their use of numerical codes and coded and/or cryptic language, words, and references to conduct their transactions. Additionally, while involved in narcotics trafficking investigations, I have communicated with other federal, state and local law enforcement personnel who specialize or have expertise in this area.

5.      Based on my training, experience, discussions with other law enforcement personnel and participation in other narcotics investigations involving drugs and money laundering, I know that:

- Drug traffickers and those who launder the money generated by drug trafficking (money launderers)[1] often hold assets in nominee names to conceal any connection between any such assets and themselves, attempting in this way to avoid detection of their illegal activities by law enforcement agencies.

- Although their assets are often held in nominee names, drug traffickers and money launderers use and enjoy them, exercising ultimate dominion and control over such assets.

---

[1] A drug trafficker can also be a money launderer and *vice versa*.

2

- Drug traffickers and money launderers often are in possession of large amounts of cash. Drug traffickers need large amounts of cash in order to maintain and finance their ongoing drug business and money launderers will often have large amounts of cash that they are in the process of laundering. Both drug traffickers and money launderers use currency counting machines to quickly and accurately count large sums of currency.

- Drug trafficking and money laundering on the scale revealed in this investigation are frequently a continuing activity that spans months or even years. Drug traffickers' inventory of controlled substances fluctuates depending on availability and demand. Drug traffickers commonly front drugs, or provide them on consignment to their customers. As a result, drug traffickers and money launderers must maintain books, receipts, notes, ledgers or some other type of record reflecting such transactions. Drug traffickers and money launderers usually keep their records in some secure yet readily accessible place where they can be used and maintained, such as in homes, storage buildings, automobiles, and safes. Drug traffickers and money launderers often keep these records of their illegal activities beyond the time during which controlled substances are actually in their possession, so that they can keep records of prior transactions for which they might owe or be owed money.

- Drug traffickers and money launderers use cellular telephones that maintain a contact list of names and numbers of co-conspirators so that they can maintain contact with their criminal associates. Drug traffickers and money launderers also often have other valuable evidence in their telephones and other electronic devices including, but not limited to, digital photographs, text messages, missed call records, recent call records, drug and money inventories and ledgers (including pay-owe ledgers) and other valuable information. I know that the forensic examination of cellular telephones will often recover deleted information including contact names and numbers as well as deleted text messages.

- Drug traffickers and money launderers hide controlled substances, currency, financial instruments, documents relating to financial transactions, precious metals, jewelry, automobiles, other items of value, and proceeds of drug transactions, all of which constitutes evidence of drug trafficking activities. Additionally, such items constitute evidence of transactions establishing the generation, transfer, concealment, and expenditure of large sums of money made from trafficking in controlled substances. Drug traffickers and money launderers maintain these items in secure yet convenient locations such as their homes, garages, businesses, storage buildings, automobiles, safes, safe deposit boxes and/or buried on the curtilage of their property.

- Drug traffickers and money launderers commonly maintain addresses or telephone numbers in books, papers, or electronic devices that reflect names, addresses, and telephone numbers for their drug trafficking and money laundering associates. These items are sometimes in code.

3

- Drug traffickers and money launderers frequently have photographs and/or video recordings of themselves, their associates, their property and controlled substances, which are often maintained in their homes, garages, electronic devices, businesses, storage buildings, automobiles, and safes. Such photographs and video recordings constitute evidence of their drug trafficking and money laundering activities, establishing their connections with items of property, with each other, and with drugs.

- Drug traffickers and money launderers who are involved in the transportation of controlled substances and money often possess documentation, such as telephone records, correspondence, wire transfers, airline ticket receipts, rental car agreements, and the like, which pertain to the acquisition, transportation, shipment, or receipt of, or payment for, controlled substances, which is evidence of the their participation in the illegal drug scheme.

- Drug traffickers and money launderers often maintain some record of the movement of money, whether it is accomplished by wire or inter-bank transfer or by a person acting as a courier. Such records, even though they may be in code, are evidence of their illegal activities.

- Drug traffickers and money launderers often use false or fictitious names or corporations or other business entities to launder their drug proceeds and to send shipments of cash or controlled substances through the mail or other delivery services. Banks, both domestic and abroad, through which proceeds from their illegal activities are laundered, are often utilized by drug traffickers and money launderers or their agents. Funds are frequently transferred between banks and various accounts to conceal their sources and origins. It is also not uncommon for drug traffickers or money launderers to obtain negotiable instruments. Documents or records of any kind reflecting any connection with any such entity or transaction constitute potential evidence that can be used against the drug trafficker or money launderer.

- Drug traffickers and money launderers frequently utilize a continuing pattern of activities to launder and conceal drug-generated proceeds and assets that lasts over a period of months or even years. Drug traffickers and money launderers use these patterns or schemes to create the appearance of legitimate income so that they can eventually convert the proceeds or assets to themselves or to a nominee under their control. In this way, the drug traffickers and money launderers can enjoy and use their properties while attempting to conceal their illegal activities, which generated the proceeds or assets.

- During the course of residential or business searches, I and other agents have found personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of a particular location. These items include, but are not limited to, bills, mail, driver's licenses, rental, purchase or lease agreements, photographs, and keys.

- In addition, during the course of residential or business searches, I and other agents have found tax documents, paystubs and other paperwork showing income and what is being reported to the Internal Revenue Service.

4

- Drug traffickers and money launderers often possess firearms, other dangerous weapons, and bulletproof vests or body armor to protect themselves and their stashes of drugs, money, or other valuables.  They also can use video surveillance systems to protect themselves and their illegal assets from being seized or stolen by others.

### INFORMATIONAL SOURCES

6.     I make this affidavit based upon personal knowledge derived from my training, experience, and participation in this investigation; information that I have learned from discussions with other investigators; the review of written reports of investigations, arrests, and seizures; the review of reports of physical surveillance conducted by state and local officers or other federal agents; the review of telephone toll records; information from court-authorized intercepts; and debriefings of sources of information and other witnesses.

7.     All statements set forth herein are stated in substance, unless otherwise indicated by quotation marks.

8.     The facts related in this affidavit do not reflect the totality of information known to me or other officers, merely the amount needed to establish probable cause.  I do not rely upon facts not set forth herein in reaching my conclusion that a warrant should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the application for a search warrant.

### PROBABLE CAUSE

9.     Beginning in the spring of 2020 through the current day, the DEA has conducted an extensive investigation into the drug trafficking and money laundering activities of the Victor Leon-Moya Drug Trafficking Organization (DTO). Through a series of controlled purchases of methamphetamine, surveillance, and court-authorized Title III wire and electronic interceptions to and from telephones utilized by members of the DTO, the DEA has determined that the DTO

is responsible for the distribution of large amounts of methamphetamine and small amounts of cocaine in the Clarksville, Arkansas area of the Fort Smith Division of the Western District of Arkansas. The DTO is led by Victor Leon-Moya, who is the owner and proprietor of Chicken Lee Auto Sales in Clarksville, Arkansas. Although Leon-Moya conducts both legitimate and illegitimate business in Clarksville, Arkansas, the investigation has revealed that Leon-Moya resides in Conway, Arkansas.

10.     In summary, and as will be demonstrated in detail within the paragraphs that follow, the investigation has revealed that Victor Leon-Moya orders quantities of methamphetamine and cocaine from a supplier located in Guadalajara, Mexico known only as "Vibora," and these quantities of controlled substances are transported by car from the Texas/Mexico border to Leon-Moya, who utilizes a network to distribute the controlled substances in the Western District of Arkansas and beyond. The investigation has revealed that Leon-Moya's top lieutenant in the DTO is Nectali Catalan aka "Miguel." Catalan reports to Leon-Moya and is responsible for the day-to-day drug trafficking operations of the DTO in the Clarksville, Arkansas area. Catalan lives at 213 Cherokee Lane in Clarksville, Arkansas (Catalan property). The investigation determined that Catalan has no other form of legitimate employment. Catalan employs a driver, Jorge Villegas, who conducts errands and makes deliveries of controlled substances and money on behalf of the DTO. Villegas lives at 308 Carlton Drive in Clarksville, Arkansas, (Villegas property) which is incidentally directly across the street from a vacant lot owned by Victor Leon-Moya. Catalan also oversees two distributors of methamphetamine relevant to this Application: Juan Carrillo and Joel Wood, who in turn distribute methamphetamine to their own customers. Carrillo lives in a residence located at 103 Woodstock Lane in Clarksville, Arkansas (Carrillo residence). Like Catalan, the investigation

6

revealed that Juan Carrillo has no other form of legitimate employment. Joel Wood, who in addition to selling methamphetamine is self-employed bailing hay, has a son, Ryan Wood, who is involved in distribution activities for the DTO as well. Joel Wood, and his son Ryan Wood, live on the subject property, a tract of land in rural Johnson County, Arkansas (subject property). Ryan Wood's role in the DTO is collecting money and distributing methamphetamine which his father secures from Leon-Moya via Nectali Catalan.

11.     On May 20, 2020, investigators with the State of Arkansas 5th Judicial District Drug Task Force interviewed Alexandrea Keenan.[2]  Keenan had been arrested on an unrelated felony charge in Franklin County, Arkansas and agreed to be interviewed in hopes of receiving consideration on her felony charge.  The statement given by Keenan, both summarized and directly quoted below, has been largely corroborated by court-authorized Title III interceptions on telephones utilized by Juan Carrillo and Nectali Catalan, and by controlled purchases of methamphetamine from Juan Carrillo and Joel Wood; therefore, I believe the statement given by Keenan on May 20, 2020 can be trusted as true and accurate.  In a recorded interview, Keenan detailed that she received approximately a kilogram of methamphetamine per week to sell from an individual whom she only knew as the "old man," but that the "old man" had a son named Ryan. Keenan provided the telephone numbers for the "old man and Ryan." Keenan detailed that the "old man and Ryan" used to receive their methamphetamine from a "Mexican named Juan" who lived off of White Drive in Clarksville, Arkansas. However, Keenan detailed that sometime between January and March of 2020 the "old man and Ryan" stopped dealing directly with "Juan" and began dealing with Juan's superior, who the "old man and Ryan" referenced as "Miguel." Keenan stated that she had only met "Miguel" on a single occasion at the residence

---

[2] Alexandrea Keenan died of a heroin overdose in Fort Smith, Arkansas on June 30, 2021. Her overdose death has no apparent connection to the instant investigation which is the subject of this Affidavit.

associated with "Juan" in Clarksville, Arkansas, and that "Miguel" does not "get close to" the methamphetamine. Keenan further detailed that there was a car lot and police officer in Clarksville, Arkansas involved in the trafficking of methamphetamine as part of the DTO. Regarding this, Keenan stated "I went to the car lot one day. We had just got some in last summer. We were weighing it out, breaking it down and pressing it on and a detective walked through there, wearing a badge, and we were in the middle of breaking down five ounce rocks. And this cop's just leaned up against the dad gum thing. It's a female. She lets them know what they need to know." Keenan went on to provide a physical description of the police officer who walked through the car lot's shop while she was breaking down methamphetamine for sale. Keenan stated that the car lot in which this occurred was located "across from Dodge's Chicken in Clarksville," and that the police officer who arrived while she was participating in the breakdown of methamphetamine was talking to one of the "older 'vatos' who was the owner," and that she "sat in a little chair right by his door while we were right there doing it. She was respected by him."

12.    From this investigation, Affiant has learned that the "old man and Ryan" are DTO members Joel Wood and Ryan Wood. The telephone numbers provided by Keenan for "the old man and Ryan" are numbers which were intercepted and used by the Woods during the court-authorized Title III interceptions of Juan Carrillo and Nectali Catalan's telephones and are still in use today. Likewise, Affiant has learned that Joel and Ryan Wood are part of the same DTO as Juan Carrillo, who lives on Woodstock Lane, which is adjacent to White Drive in Clarksville. Affiant has also learned from the investigation that Nectali Catalan, who goes by "Miguel" to the individuals whom he supplies methamphetamine, is a supplier of methamphetamine to Joel Wood and Juan Carrillo. Affiant is also aware that the investigation involves a car lot located at

8

410 E Main Street, Clarksville, Arkansas called Chicken Lee Auto Sales, which is across the street from a fried chicken restaurant called Dodge's Chicken in Clarksville.  The proprietor of Chicken Lee Auto Sales, according to a State of Arkansas public records search for the business, is Victor Leon-Moya. Thus, I believe when Keenan spoke of being present at a "car lot across from Dodge's Chicken" during the packaging of methamphetamine for sale, she was speaking of being at Leon-Moya's Chicken Lee Auto Sales property during the DTO's drug trafficking activities.

13.    In July of 2020, the DEA debriefed an individual who will be referenced throughout this Affidavit as CS1.[3] CS1 reported in their initial debriefing upon arrest in July 2020 that Joel Wood and his son, Ryan Wood, were both involved in the sale of methamphetamine in the Johnson County, Arkansas area and that they were supplied with methamphetamine by an individual known only to CS1 by references from Joel Wood as "Juan." CS1 positively identified known photographs of target subjects Joel and Ryan Wood. CS1 also started that Joel Wood maintained a warehouse or "stash house" location at his property, the subject property here, where "Juan" would store methamphetamine.

14.    On August 4, 2020, CS1 met with investigators with the 5th JDDTF and Arkansas State Police to arrange a controlled purchase of methamphetamine from target subject Joel

---

[3] CS1, the confidential source utilized for the controlled purchases on Joel Wood and later on Juan Carrillo is no longer an active confidential source for the DEA. When the confidential source was an active source for the DEA, they were receiving consideration in the form of cash payments and a dismissal of local, State of Arkansas methamphetamine-related charge for their efforts as an informant. The confidential source had a criminal history which included arrests in Arkansas in 1994 for carrying a weapon, distribution of marijuana, and terroristic threatening; in Arkansas in 1995 for arson; in Arkansas in 1996 for misdemeanor battery; in Arkansas in 2000 for possession of controlled substances; in Arkansas in 2001 for possession of marijuana and felon in possession of a firearm; and in Arkansas in 2008 for misdemeanor battery.  The confidential source's information was corroborated as truthful through surveillance, public records, telephone toll analysis, and controlled purchases of methamphetamine by both the confidential source and later by an undercover agent.  As such, I believe the confidential source was a reliable informant and the information provided by the confidential source was truthful and can be trusted as accurate.

Wood. At approximately 1:06 pm, CS1 was searched and their vehicle was searched with no contraband located and they were provided with a recording device to monitor and memorialize the transaction. CS1 was also provided with $3,200 in law enforcement funds to conduct the transaction. CS1 left law enforcement's area and was followed to the subject property in Clarksville, Arkansas. In route, CS1 made a call to Joel Wood. The call was uncontrolled and not observed by investigators, and only CS1's half of the conversation was captured on the recording device. After the call was over, CS1 reported to investigators that Joel Wood was not at the subject property, but that Joel Wood had left the methamphetamine in a concealed location in the subject property for CS1 to retrieve, and CS1 was to leave the money for the methamphetamine in the location where the methamphetamine was located. At approximately 1:31 pm, CS1 arrived at the subject property and immediately went inside the mobile home, where CS1 opened a military ammunition can and retrieved what appeared be approximately four ounces of methamphetamine, leaving the $3,200 in law enforcement funds in the same ammunition can. CS1 exited the mobile home and returned to their vehicle, leaving the subject property at approximately 1:34 pm. CS1 traveled directly back to law enforcement's location while under surveillance, where CS1 provided investigators with the suspected methamphetamine and recording device. CS1 and their vehicle were searched once again for contraband with negative results. The suspected methamphetamine was field tested with a positive result for methamphetamine, weighed as 177.9 gross grams and sent to the DEA laboratory for further testing, the results of which are pending.

15. On August 13, 2020, CS1 reported that they were able to arrange a methamphetamine transaction for one-quarter of a pound of methamphetamine with Joel Wood. A controlled purchase of methamphetamine was planned. In preparation, CS1's person and the

vehicle CS1 would be utilizing for the controlled purchase were searched with no contraband located. CS1 was provided with $3200 in law enforcement funds and a recording device to monitor and memorialize the transaction. CS1 was followed as they traveled to the subject property, with CS1 arriving at approximately 3:34 pm. At the subject property, CS1 met Joel Wood in person and exchanged $3,200 for what Joel Wood represented to be one-quarter of a pound of methamphetamine in a very short transaction, with CS1 leaving the subject property with the suspected methamphetamine at approximately 3:38 pm. CS1 traveled back to law enforcement's location, where they turned over the recording device and suspected methamphetamine. CS1 and their vehicle were searched again with no contraband located, then released from the operation. The substance represented as methamphetamine was field tested with a positive result for methamphetamine and weighed as 142 gross grams. The substance was sent to the DEA laboratory for confirmatory testing, the results of which remain pending.

16.    On September 30, 2020, investigators met with CS1 to conduct a debriefing and plan future controlled purchases of methamphetamine from Joel Wood. In the debriefing, CS1 stated that it was not their habit to speak with Joel Wood via the telephone; rather, CS1 traditionally would just appear unannounced at the subject property, as they had done during the controlled purchases on August 4, 2020 and August 13, 2020. An operation was planned for CS1 to appear unannounced at the subject property to engage in conversation with Joel Wood. For this meeting, CS1 and their vehicle were searched with no contraband present and CS1 was equipped with a recording device to monitor and memorialize the conversation. CS1 traveled to the subject property, where they engaged in a discussion on future methamphetamine prices and CS1 expressed a desire to introduce a "friend" to Joel Wood in the future, the "friend" being an undercover DEA agent whom would begin making their own purchases of methamphetamine

from Joel Wood and attempt to meet Joel Wood's supplier of methamphetamine. A discussion was conducted regarding Joel Wood's ability to provide CS1 or CS1's "friend" with two pounds of methamphetamine. Also during this meeting, Joel Wood provided CS1 with a single crystal shard, or "rock" of what was represented as a sample of methamphetamine.  When the meeting was complete, CS1 left the subject property and traveled back to law enforcement's location, where CS1 provided investigators with the sample of represented methamphetamine and the recording device. CS1 and their vehicle was searched again with no contraband located and released from the operation. The sample of methamphetamine provided by Joel Wood was weighed, with a gross weight of 31.7 grams, including packaging.  The sample of methamphetamine was also field tested with a positive result for methamphetamine. The sample was sent to the DEA laboratory for confirmatory testing, the results of which remain pending.

17.    On November 4, 2020, an operation was planned wherein CS1 would introduce an undercover DEA agent (UC) to Joel Wood and the UC would then attempt to purchase two pounds of methamphetamine from Joel Wood.  CS1's person and vehicle, which was to be utilized for the operation, was searched with no contraband located. Both the UC and CS1 were equipped with recording devices to monitor and memorialize the transaction. The UC and CS1 traveled to the subject property, Arkansas, arriving at approximately 2:20 pm.  CS1 and Joel Wood engaged in negotiations for two pounds of methamphetamine; however, a price could not be agreed upon so CS1 and the UC left the subject property.

18.    Almost immediately upon leaving the subject property, Joel Wood called CS1. The call was captured on a recording device. Very early in the call, CS1 gave their cellular telephone to the UC, who spoke directly with Joel Wood regarding a future methamphetamine transaction.  Joel Wood offered to sell the UC one-and-a-half pounds of methamphetamine for

$10,200, and the UC declined the transaction as too expensive. The UC and CS1 returned to law enforcement's location, where CS1 and their vehicle were searched once again for contraband with none located and released from the operation.

19.    At approximately 3:50 pm, CS1 contacted affiant and stated that they had been contacted in an uncontrolled telephone call by Joel Wood, who agreed to sell the UC two pounds of methamphetamine for $10,000. CS1 reported that after he agreed to the transaction, Joel Wood contacted CS1 once again in an uncontrolled communication and told CS1 that he had left the two pounds of methamphetamine in a secluded area on CS1's property for CS1 to retrieve, and that CS1 could provide Joel Wood with payment for the methamphetamine at a later time. Law enforcement responded to CS1's location at approximately 4:50 pm, where CS1 provided law enforcement with two clear vacuum-sealed bags, each containing a substance that was collectively weighed as 1,059 gross grams. The substance field tested positive for the presence of methamphetamine. The substance has been sent to the DEA laboratory for confirmatory testing, the results of which remain pending.

20.    In order to facilitate a controlled payment for the methamphetamine, CS1 and the UC conducted a series of controlled, recorded telephone calls with Joel Wood. In this call, the UC and Joel Wood agreed for the UC to travel to the subject property to provide Joel Wood with payment for the methamphetamine. At approximately 6:30 pm, the UC arrived back at the subject property and had a short meeting with Joel Wood. The UC did not exit their vehicle, and spoke with Joel Wood, who walked to the driver's window of the vehicle. In the meeting, the UC provided Joel Wood with a red drawstring bag containing $10,000 in law enforcement funds. With the transaction complete, the UC left the subject property and the operation was ended. The

payment by the UC to Joel Wood of $10,000 at the subject property was captured on a recording device concealed on the UC's person.

21.    On November 13, 2020, Ryan Wood was traffic stopped by a deputy with the Johnson County Sheriff's Office. A traffic stop on a BMW sport utility vehicle was conducted because the investigating deputy suspected the driver was intoxicated because of erratic driving. The vehicle contained two occupants, with the driver of the vehicle was identified by his Arkansas driver's license as Ryan Wood. The investigating deputy immediately noticed an AR-15 style rifle in plain view in the backseat of the vehicle and two handguns near the passenger seat of the vehicle. Both occupants of the vehicle were removed and placed in handcuffs as a result of the three weapons in plain view. Ryan Wood advised that all of the firearms in the vehicle belonged to him and that there was a 4th firearm in the center console of the vehicle. Ryan Wood gave permission to search the vehicle. In the backseat of the vehicle, a camouflage-colored bag was located that contained several empty ziplock-style baggies and a notebook. The notebook contained a list of names with dollar amounts listed next to them that I believe based on my training, experience, and knowledge of this investigation to be a ledger used to track narcotics sales. In the engine compartment of the vehicle, a magnetic box located in a void on the passenger side. Inside the box, a plastic baggie containing a crystal substance consistent with methamphetamine was located. The substance was sent to the Arkansas State Crime Laboratory for additional testing and determined to be 5.5810 grams of a mixture or substance containing methamphetamine. Ryan Wood also allowed a search of the telephone in his possession, which the investigating deputy noted contained text messages consistent with the trafficking of controlled substances. In addition, the telephone contained a contact labeled as

"Juan Number2" with a telephone number of 479-774-0680, which was later determined to be Juan Carrillo, as described below.

22.     In early 2021, Joel Wood introduced CS1 to Juan Carrillo. On February 3, 2021 and February 12, 2021, CS1 purchased a collective 69.89 gross grams of methamphetamine from Juan Carrillo in two controlled transactions at Carrillo's residence on Woodstock Lane in Clarksville, Arkansas. On February 26, 2021, CS1 introduced the same undercover DEA agent to Juan Carrillo, and the undercover agent purchased 49 gross grams of methamphetamine from Carrillo in a controlled transaction. On March 23, 2021, the undercover agent purchased another 54.91 gross grams of methamphetamine from Juan Carrillo; and on April 22, 2021, the undercover agent purchased another 87.1 grams of actual methamphetamine, as confirmed by the DEA laboratory after testing. All of the controlled transactions between Carrillo and the undercover agent occurred at Carrillo's residence on Woodstock Lane in Clarksville.

23.     The above-referenced information, in part, allowed the DEA to obtain a Title III interception order from the Hon. P.K. Holmes, III for Juan Carrillo's 479-774-0680 telephone, the same telephone number Ryan Wood had listed as "Juan Number2" in his telephone.[4] Interceptions began on June 1, 2021 and quickly revealed that Juan Carrillo was supplied with methamphetamine by Nectali Catalan. For example, on June 8, 2021 at approximately 6:43 pm, a telephone call was intercepted between Carrillo and Catalan.[5] In this call, Catalan[6] inquires if Carrillo "needs vegetables," and an agreement is made for Catalan to bring "4 pounds of

---

[4] WDAR Case No. 2:21 CM 49.
[5] The telephone dialogue between Carrillo and Catalan was in Spanish. In all cases, a professional linguist employed by the DEA has provided a translation of the communication. The translation is not intended to be viewed as a verbatim, word-for-word transcript of the dialogue, but does capture the essence of the communication.
[6] At the time of this call and every intercepted call prior to approximately July 16, 2021, the investigation had not yet positively established the identity of Nectali Catalan, whom Juan Carrillo addressed as "Miguel." "Miguel's" identity as Nectali Catalan was established on approximately July 16, 2021. For purposes of clarity, throughout this affidavit Nectali Catalan will be referenced as "Nectali Catalan," or "Catalan."

vegetables" later in the evening. At approximately 8:59 pm, surveillance at the Carrillo residence observed as Catalan arrived and met with Carrillo. I believe based upon my training, experience, and knowledge of this and similar investigations that "4 pounds of vegetables" is actually a coded reference to 4 pounds of methamphetamine, and that Catalan delivered 4 pounds of methamphetamine to Carrillo at approximately 8:59 pm on June 8, 2021.

24.     On June 14, 2021 at approximately 4:09 pm, another telephone call was intercepted between Carrillo and Catalan, and in this call the following dialogue occurred:

| | |
|---|---|
| Catalan: | How much money do you have for me? |
| Carrillo: | I have about a thousand, buddy. I am waiting for more money. I told them to see if they want to, I told them I was going to call you first to see if there was something. |
| Catalan: | No but pay me some for the four (4) I brought you that day. |
| Carrillo: | Oh yeah, I am waiting for that money. |

I believe this dialogue represents Catalan's unwillingness to provide Carrillo with more methamphetamine until Carrillo has paid for the methamphetamine which Catalan provided previously on June 8, 2021, described above. As a result of this, the investigation revealed that Carrillo then turned to Joel Wood, the resident of the subject property, to obtain a resupply of methamphetamine.

25.     On June 18, 2021, at approximately 11:58 am, a telephone call was intercepted between Joel Wood and Juan Carrillo in which Joel Wood agreed to provide one pound of methamphetamine to Carrillo for $6,000. Joel Wood agreed to come collect the money for it late that day, but that he would send his son Ryan Wood with the methamphetamine the following day. At approximately 3:50 pm, Joel Wood was observed by surveillance arriving at Carrillo's residence, where he conducted a short meeting with Carrillo. I believe at this meeting Carrillo

provided Wood with a quantity of money. The following day, at approximately 7:54 am, surveillance observed Ryan Wood arrive on a motorcycle at the Carrillo residence. I believe based upon the interceptions that at this meeting, Ryan Wood provided Juan Carrillo with the methamphetamine Carrillo had discussed with Joel Wood the previous day. Indeed, just after Ryan Wood's arrival, the DEA began intercepting telephone calls to and from Carrillo and his various customers, making agreements for them to come to his residence and obtain methamphetamine later in the day. Surveillance observed several individuals arrive at Carrillo's residence, stay a short time, then leave. I believe these individuals likely received methamphetamine which Joel Wood provided to Carrillo via Ryan Wood on June 19, 2021.

26.     Two days later, on June 21, 2021, a telephone call was intercepted between Joel Wood and Juan Carrillo in which they discussed their mutual supplier of methamphetamine, Nectali Catalan. In this discussion, Carrillo told Joel Wood, "he (Catalan) knows I asked you for help." I believe this is a reference to the drug transaction on June 19, 2021 between Joel Wood and Juan Carrillo, discussed above, which came about as a result of Catalan's unwillingness to provide methamphetamine to Juan Carrillo because of Carrillo's debt to the overall DTO.

27.     As a result of the paragraphs above and other aspects of the investigation not relayed herein, on July 16, 2021 the DEA began interceptions of Nectali Catalan's 479-979-5190 telephone.[7] Through these interceptions, the investigation established that Nectali Catalan's superior in the DTO is Victor Leon-Moya, who Catalan sometimes refers to as "Gordo." It was also established that on a regular basis, Catalan visited the subject property to either collect money from Joel Wood for methamphetamine sales, or to provide Joel Wood with methamphetamine to sell, or a combination thereof, as will be demonstrated in the paragraphs which follow.

---

[7] WDAR Case No. 2:21 CM 61.

28.    On July 24, 2021 at approximately 10:37 am, a telephone call was intercepted between Catalan and Wood.  In the call, the following dialogue was intercepted:

> Joel Wood (JW):    Eight forty, eight forty or some right now. I got two sold for tonight, I'll pick up tonight.
>
> Nectali Catalan (NC): Yeah!
>
> JW:    And then they are trying to get that money out of Walmart right now.
>
> NC:    Okay, then see, see you in 25 minutes. 40 minutes in your house for the 840.
>
> JW:    You coming to my house?
>
> NC:    Yes!
>
> JW:    Yes, that will be fine.

In this conversation, I believe based on my training, experience, and knowledge of this investigation that Joel Wood is telling Nectali Catalan that he has $840.00 available for pickup for past methamphetamine sales, but believes he will have additional money available later when some of his customers, who have asked for "2," likely two ounces of methamphetamine, obtain money from Walmart to make the purchase. I further believe when Catalan says he is coming "to the house," he is stating that he is coming to the subject property to collect the funds from past methamphetamine sales that are in Joel Wood's possession.

29.    On July 27, 2022 at 3:29 pm, a telephone call was intercepted between Catalan and Villegas[8] in which the following dialogue[8] occurred:

> Catalan:    What are you doing later? We have to go see the dude later.
>
> Villegas:    Alright, well come get me, dude and we go see him.

---

[8] The telephone dialogue between Catalan, Villegas Carrillo, and Leon-Moya was in Spanish. In all cases, a professional linguist employed by the DEA has provided a translation of the communication. The translation is not intended to be viewed as a verbatim, word-for-word transcript of the dialogue, but does capture the essence of the communication.

> Catalan:     I will come by and get you around 5:50 pm.

At 5:48 pm, another telephone call was intercepted between Villegas and Catalan which indicated that Catalan went to collect Villegas in order to meet with "the dude," likely their superior in the DTO, Victor Leon-Moya. The following dialogue occurred:

> Catalan:     I'll be there shortly, George. I'm leaving the house now.
>
> Villegas:    Alright.

I believe these calls signify Catalan picking up Villegas so that they could travel and meet with "the dude," who I believe is likely Victor Leon-Moya. Indeed, based upon information received later, relayed below, I believe a meeting of sorts between the members of the DTO occurred at Chicken Lee Auto Sales on July 27, 2021.

30.     The information regarding the DTO's July 27, 2021 meeting was obtained from a confidential source who will be referenced herein as CS2. CS2 has a criminal history which includes a 2017 State of Arkansas felony conviction for possession of drug paraphernalia and 2020 State of Arkansas felony conviction for distribution of methamphetamine. CS2 is not currently facing any charges and is receiving cash considerations for their efforts as a confidential source. CS2's information has been corroborated through surveillance, studies of toll records, and wire and electronic interceptions; therefore, I believe that CS2 is a reliable informant whose information can be trusted as accurate.

31.     On approximately July 29, 2021, CS2 was debriefed by investigators with the State of Arkansas 5th Judicial District Drug Task Force. CS2 reported that they had spent the last several days at the subject property with Ryan Wood, who together with his father Joel Wood were distributors of methamphetamine in the Clarksville, Arkansas area. CS2 reported that Joel and Ryan Wood were in heavy debt to their suppliers, for whom CS2 did not know an identity, but knew they

were Hispanic men. CS2 reported that on approximately July 27, 2021, Ryan Wood had taken CS2 to "a car lot across from Dodge's Chicken," where CS2 was made to wait in the vehicle while Ryan Wood went to meet with an individual Ryan Wood described as his "boss." CS2 reported that inside the car lot, Ryan Wood met with a Hispanic male whom CS2 did not recognize from their position in the parked vehicle. CS2 reported they attempted to engage Ryan Wood about the individual when he returned to the vehicle; however, Ryan Wood would not discuss the matter further with CS2. CS2 reported that they did not ask further questions as they believed it would arouse suspicion in Ryan Wood. I believe based upon my knowledge of this investigation that the car lot CS2 described in their debriefing is Chicken Lee Auto Sales in Clarksville, Arkansas, and that the individual Ryan Wood met with inside the business, described by CS2 as Ryan Wood's "boss," was likely either Victor Leon-Moya or Nectali Catalan, or both. I believe based upon the intercepted calls between Villegas and Catalan on July 27, 2021, quoted above, that Villegas was likely in attendance at this meeting as well.

32.     On July 28, 2021, a telephone call was intercepted between Villegas and Catalan which appears to reveal that DTO member Joel Wood received methamphetamine from Jorge Villegas. The following dialogue occurred:

Catalan:     Did the old man answer you? Or what?

Villegas:     He already came for the things.

Catalan:     Oh, he came? Okay.

(later in the same conversation)

Catalan:     How did the old man look to you?

Villegas:     Panicked.

(later in the same conversation)

Catalan:     Did the old man leave you papers?

| | |
|---|---|
| Villegas: | No. |
| Catalan: | [explicative] You see he said…they get all into their stuff and then later they don't level off…that's the truth, that's why that happens. |

I believe that this dialogue signifies several things. First, I believe that when Villegas and Catalan speak of the "old man," they are speaking of Joel Wood. I believe when Villegas says that he "came for the things," this means that Joel Wood visited Villegas and obtained methamphetamine from Villegas. I believe when Catalan asks about Joel Wood "leaving papers," he is asking about whether or not Joel Wood left money to pay for methamphetamine, to which Villegas responds in the negative. I believe that Catalan's response is one of frustration, opining that the reason Joel Wood is panicked and not paying is because he was "getting into their stuff," meaning that Joel Wood was using the methamphetamine he is also selling for the DTO.

33.     On July 30, 2021, a telephone call between Catalan and Leon-Moya was intercepted at approximately 2:07 pm in which Catalan gave Leon-Moya a report of sorts regarding the members of the DTO. The following relevant dialogue occurred regarding Joel Wood and the subject property:

| | |
|---|---|
| Nectali Catalan (NC): | He is, he is very spooked the old man. Well not spooked but, he had slowed down, he had slowed down since what happened to those guys and, and the other day that I went to speak with him, he told me… |
| Leon-Moya (LM) : | Uh huh! |
| NC: | He told me that he felt as he was being watched. |
| LM: | Uh huh! |
| NC: | And just now, I asked Jorge and he sent a message to Jorge. He told him that he feels he's been closed in. |

21

| | |
|---|---|
| LM: | Yeah! |
| NC: | He feels closed in and in all truth he does not want to fuck it up and, and he is going to completely stop, man! |
| LM: | Uh huh! |
| NC: | He is going to stop completely and he is going to see what's up. But… |
| LM: | Alright. |
| NC: | But that day that I went to speak with him. |
| LM: | Uh-huh! |
| NC: | I saw him all spooked and he was not, not fucked up or anything man. |
| LM: | Uh-huh! |
| NC: | He was saying that, that there was two, three cars that, honestly, were suspicious driving around in front and back and everything. |
| LM: | Uh-huh! |
| NC: | And he thinks that, that one of those guys that, that shit hurt, that they could have put the finger on him, man! |
| LM: | Uh-huh! |
| NC: | And now, and now what do you think man? Should he stop to see what happens with this or what? |
| LM: | Well yeah, man! |
| NC: | The problem is that the show will fall apart. He, he was the strong one, man! |
| LM: | Yeah, right! |

(later in the conversation)

| | |
|---|---|
| LM: | He doesn't owe you much right? |

NC:     Who?

LM:     The guy.

NC:     Yeah man! yeah. From the fifty (50) he hasn't paid much, man. He hasn't paid much man! I'm telling you the old man is spooked, he is spooked man. He is spooked and that's what has me out of whack because other times, according to him he is spooked but because of that shit but right now he's good.

LM:     Uh-huh!

NC:     Lets see what up... When I come back I'm going to look for him and talk to him and I can see him around and see what's up.

LM:     Uh-huh!

NC:     Yeah, well we are gonna have to reorganize because we are going to be fucked.

LM:     Yeah!

NC:     Yeah, and it's going to be worse for me because, because I work with that man if not, where is the money going to come from.

LM:     I'm in the same boat, man.

(later in the conversation)

LM:     Hopefully he won't dump what the the asshole has.

NC:     What?

LM:     ...that he doesn't dump what the guy has.

NC:     How?

LM:     Because he is spooked he might dump it.

NC:     No, no, no. He told Jorge he was going to stop and he was going to see how things were. That, that depending on what he saw, he'd see what's up. The old man, the old man has a lot of land where he can bury all that shit man.

23

34.     I believe this dialogue between Catalan and Leon-Moya is regarding Joel Wood and the subject property.  Specifically, I believe that based upon the conversation Catalan had with Villegas about the potential of Joel Wood being a methamphetamine user, quoted above, the Catalan paid a visit to Joel Wood at the subject property. I believe that Catalan reports to Leon-Moya that Joel Wood is not using methamphetamine, and that Joel Wood is merely paranoid from seeing two or three cars he does not recognize driving around the subject property. I believe that Catalan is concerned that if Joel Wood ceases to sell methamphetamine, the DTO will collapse, as Joel Wood "was the strong one," and if Joel Wood ceases selling methamphetamine, the DTO will "have to reorganize because we are going to be [explicative]". I also believe that in this conversation that Catalan and Leon-Moya discuss Joel Wood's debt to the DTO, describing it as "fifty," which I believe means $50,000. I believe this corroborates CS2's statement about Joel and Ryan Wood's heavy debt to the DTO. I also believe that Leon-Moya expresses concern that Joel Wood will destroy or "dump" any methamphetamine he has at the subject property as a result of his paranoia, a concern Catalan dismisses because Wood has "a lot of land where he can bury all that [explicative] man."

35.     The investigation revealed that Joel Wood, despite Catalan and Leon-Moya's concerns, continued to sell methamphetamine for the DTO.  For example, on August 9, 2021 at approximately 5:20 pm, a telephone call was intercepted between Joel Wood and Catalan in which Catalan makes arrangements to meet Joel Wood on the subject property, this time in a shop building on the property.  The following dialogue occurred:

NC:   What time to see you?

JW:   It doesn't matter to me. You tell me.

NC:   Uh…

JW:    Uh, come here to the house.

NC:    In, in your house?

JW:    Yes.

NC:    Is no, no problem?

JW:    Just come to the house...I'll see...see what they do.

NC:    [unintelligible]

JW:    I think you'll be fine.

(later in the same conversation)

JW:    Yeah, come to my shop, yeah.

NC:    In your shop?

JW:    Yes.

NC:    Okay...and the road is good for the, the people? Is fine?

JW:    Yes, just come...just pull up like you're going to get something fown at the shop. That way we ain't gotta worry about nothing.

I believe based upon my training, experience, and knowledge of this investigation that although Catalan and Wood did not explicitly state the reason for their meeting, the purpose of the meeting is likely for Wood to provide Catalan with money from methamphetamine sales, for Catalan to provide Wood with methamphetamine to sell, or both. I believe that the dialogue regarding "the road," and whether or not it is without "problems" and "fine," is likely a reference to whether there is a police presence in the area. I also believe that when Wood tells Catalan to come to "his shop," he is referencing one of the metal buildings on the Wood property.

36.    Similarly, on August 11, 2021, a series of communications were intercepted between Nectali Catalan, Jorge Villegas and Joel Wood which make it appear that Jorge Villegas drove Nectali Catalan to the subject property so that Catalan could provide Wood with a resupply

25

of methamphetamine and Wood could provide Catalan with money he had earned from the sale of methamphetamine. Between 12:48 pm and 12:59 pm, a series of text messages were intercepted in which Joel Wood and Catalan generally discussed meeting later in the day. At 6:33 pm, a telephone call was intercepted between Catalan and Jorge Villegas in which Catalan inquired as to whether or not Villegas' vehicle, a grey Chevrolet Cruz, had license plates and insurance. Shortly after this telephone call, between 6:53 pm and 7:03 pm, another series of text messages between Catalan and Joel Wood were intercepted in which Catalan agreed to bring Wood "work," which I believe is coded language for methamphetamine, when they met later that evening.

37.    Believing that a methamphetamine transaction was imminent, the DEA established surveillance on the Catalan residence and observed at 7:33 pm as Villegas picked up Catalan. While Villegas and Catalan were driving, at approximately 7:41 pm a telephone call was intercepted between Catalan and Wood in which they agree to meet shortly on the subject property. The subject property has an electrical-line easement which cuts through the property, and Joel Wood would frequently refer to this easement as "the back hill." This is the location on the subject property where Catalan and Joel Wood agreed to meet. A short time later, Affiant, while conducting surveillance, observed Joel Wood, Ryan Wood, Jorge Villegas, and Nectali Catalan on the electrical-line easement of the subject property. I believe based upon this surveillance and the associated interceptions that at this meeting, Joel Wood and Ryan Wood received a resupply of methamphetamine from Catalan and Villegas, and the Woods provided Catalan with payment for methamphetamine previously sold. I further believe Catalan thought it important that Villegas' vehicle have tags and insurance because they would be utilizing it to transport methamphetamine to the subject property.

38.    On August 14, 2021, at approximately 3:38 pm, a call was intercepted between

Catalan and Wood where they again made arrangements to meet at approximately 6:30 pm on "the back hill." Regarding this meeting, Catalan asked "You have more money for me today?" In response, Joel Wood stated "I got a little bit, man." I believe that this exchange is regarding money that Joel Wood has on hand to pay Catalan for past methamphetamine sales, and they intend to meet at approximately 6:30 pm on the subject property so Catalan can collect it from Joel Wood.

39.     On September 5, 2021, the DEA began interceptions on a second telephone utilized by Nectali Catalan: 479-774-8367.[9] The DEA determined that when Leon-Moya would talk to Catalan on Catalan's 8367 telephone, Leon-Moya would use a different telephone number: 479-774-2602. 479-774-2602 is subscribed to Victor Leon-Moya at 410 East Main Street, Clarksville, AR 72830, which is the address for Leon-Moya's Chicken Lee Auto Sales.

40.     On September 17, 2021, at approximately 3:07 pm, a telephone call was intercepted in which Leon-Moya dispatched Catalan to send $1,200 by wire transfer to "Vibora." In this discussion and in a subsequent discussion intercepted on September 18, 2021 at approximately 9:21 am, Catalan and Leon-Moya discussed sending it in such a manner so that Catalan would not have to provide an ID to make the transfer. They discussed sending it through "Herradura" the following day. On September 19, 2021 at approximately 4:34 pm, a telephone call was intercepted in which Catalan confirmed to Leon-Moya that he had sent $1,185 to "Vibora" through "Herradura," and that Catalan did not have to show his ID to make the transfer. Subsequent investigation revealed that "Herradura," is a reference to a western-wear store in Clarksville, which also is a franchise for InterCambio Express, a money remitting business based in Indiana. Records obtained from InterCambio Express indicate that on September 19, 2021, at 4:30 pm (4 minutes prior to the intercepted call above), Catalan had provided InterCambio Express with $1,200, $1,185 of which

---

[9] WDAR Case 2:21 CM 79

they transferred by wire service to "Pedro Vallejo Rivera" of Guadalajara, Mexico. InterCambio Express retained $15 as their fee for making the wire transfer. InterCambio Express' records indicate that the $1,185 was picked up in Guadalajara, Mexico at approximately 5:02 pm the same day. While I believe that it is likely that "Vibora" is "Pedro Vallejo Rivera," there have been not outlets to date in the investigation to verify this belief. To date, "Vibora" remains unidentified and unknown to the investigation.

41.    I believe based upon my training, experience, and knowledge of this and similar investigations that the money sent to "Vibora" on September 19, 2021 likely represented a deposit for an upcoming load of methamphetamine to be shipped to Leon-Moya and Catalan, and when the methamphetamine arrives that the remainder of the balance due will be paid in cash and sent with the courier who delivers the methamphetamine. This theory was bolstered by further interceptions and investigative activities which are detailed below.

42.    On September 22, 2021 at approximately 9:21 pm, a call was intercepted between Catalan and Leon-Moya in which "Vibora" was once again discussed. The following dialogue was intercepted:

LEON-MOYA: He's bugging me... asking how much we have gathered for him, and shit.

CATALAN: Who?

LEON-MOYA: Vibora.

CATALAN: He needs to chill out. We are just making it.

(later in same conversation)

LEON-MOYA: Uh... [U/I] so they could send him something.

CATALAN: Sure!

LEON-MOYA: Let me see, buddy.

CATALAN: We'll see how much we can put together for him.

I believe that this dialogue represented Leon-Moya telling Catalan that "Vibora" is persistently asking for more money to pay for methamphetamine which was previously provided on credit. I believe that to appease him, Leon-Moya and Catalan planned to collect as much money as they can and send it to "Vibora" to appease him. This belief was reinforced by the interceptions that followed.

43.     On September 27, 2021 at approximately 3:01 pm, a telephone call was intercepted between Catalan on the Catalan 8367 telephone and Leon-Moya on the target telephone. In this call, the following relevant dialogue occurred:

> CATALAN: There are forty-two 42 bucks that we could gather. Forty-two (42) and three-hundred (300). I don't remember. A little bit over forty-two (42), buddy.
>
> LEON-MOYA: So... I will answer to the guy, and... do you remember? It was a month and a half? And sending him the money... uh...
>
> CATALAN: [unintelligible]
>
> LEON-MOYA: I told him "the twenty-fifth (25) does not count, buddy. Give me time".
>
> CATALAN: Yes. Well, you can send... send him... at least... we have to divide it fourteen (14), fourteen (14), and fourteen (14), buddy. Just... uh... send him that.
>
> LEON-MOYA: Uh... there is a lot of police. That fucker keeps pestering me.

I believe this dialogue signified that the DTO owed a collective $42,000 to "Vibora," in late September of 2021, and to appease "Vibora," their plan is to send "Vibora" three separate payments of $14,000 each.

44.     Later in the same conversation, they speak of their troubles collecting money, and the conversation specifically turns to Joel Wood. The following dialogue occurs:

> CATALAN: Well, yes. Like I said. That is there, so you can something to Pedro. I'm hustling here, buddy. Like I told you, the old man is doing good, buddy. He works hard.
>
> LEON-MOYA: Is he [unintelligible]?

I believe in this exchange, Catalan is telling Leon-Moya that collecting money from methamphetamine sales to be used to appease "Pedro," (likely "Pedro Vallejo Rivera" from the wire transfer above, who I believe is "Vibora,") will not be difficult, as the "old man," or Joel Wood, is working hard at selling methamphetamine.

45.     The following day, September 28, 2021, a series of interceptions occurred in which it was apparent that Catalan and Joel Wood intended to meet in order for Joel Wood to provide Catalan with money from Joel Wood's methamphetamine sales.  Subsequent to these calls, interceptions were obtained between Catalan and Leon-Moya which indicated a plan to meet so Catalan could provide the money collected from Wood to Leon-Moya for eventual payment to "Vibora."

46.     On September 29, 2021 at approximately 6:08 pm, a telephone call was intercepted between Leon-Moya and Catalan in which they discussed Catalan providing Leon-Moya money in yesterday's meeting. The following relevant dialogue occurred:

> LEON-MOYA: I was going to ask you. How much did you give me yesterday, buddy?
>
> CATALAN: 16-250.

Later in the same call, Catalan provides Leon-Moya with a breakdown of the money provided, stating "[t]here were 42... 42-500, fourteen for Vibora, and fourteen (14) 250, and fourteen (14) 250, buddy." I believe that Catalan's statement to Leon-Moya "fourteen for Vibora," represents one of the $14,000 payments that Catalan and Leon-Moya had previously discussed on September 27, 2021, as relayed above.

47.     On October 26, 2021, the DEA began interceptions of Leon-Moya's 479-774-2602

telephone.[10] On November 1, 2021, interceptions and surveillance appeared to establish that Leon-Moya received a resupply of methamphetamine from an individual later determined to be Ivan Lujan. On October 21, 2021 at approximately 4:28 pm, a telephone call was intercepted between Leon-Moya and the then-unknown user of 956-436-2437, later determined to be Ivan Lujan. In this call, Lujan details that he believes he will be at Leon-Moya's location, a hotel and restaurant in Conway, Arkansas, around midnight. Surveillance was established in Leon-Moya's location, and at 1:41 am investigators observed as a Ram pickup truck arrived and Leon-Moya exited the hotel and restaurant to meet with the driver. The license tags on the Ram pickup truck were form Texas and returned to an address in Laredo, a city in Texas on the Mexico border. Leon-Moya and the driver then went into the hotel, presumably to get the driver a hotel room. At 2:15 am, investigators observed the driver of the Ram pickup truck take two large duffel bags into a hotel room on the back of the building.

48.     The following morning, at approximately 10:37 am a telephone call was intercepted between Leon-Moya and Nectali Catalan. In this call, Leon-Moya tells Catalan that "the dude" is "here now, and we need to send money with him." In reply, Catalan states "[l]ike 9 per head. This shit is not working. I'm giving this shit 1 or 2 days later they complain about it. Everyone is. If the shit is not good we're not going to make it." I believe based upon my training, experience, and knowledge of this investigation that this statement likely means that Catalan believes they need to send $9,000, or "9" per kilogram, or "head" of methamphetamine with the driver who arrived the previous evening. I further believe that Catalan's statement about "the shit not working," and people "complaining about it," is likely a commentary on the quality of methamphetamine they had received previously, with a hope by Catalan that the supply which had just arrived will be of

---

[10] WDAR Case No. 2:21 CM 95.

better quality.

49.     At approximately 11:40 am on November 1, 2021, Leon-Moya traveled from his location at the restaurant and hotel in Conway, Arkansas, to Nectali Catalan's home on Cherokee Lane in Clarksville, Arkansas. I believe it likely that Leon-Moya provided Catalan with the resupply of methamphetamine brought by Lujan at this time. Leon-Moya entered Catalan's residence through the open garage door, which surveillance observed shut after his arrival in the residence. For the next several hours, a number of interceptions were obtained from the Leon-Moya telephone which made it apparent that Leon-Moya was collecting money from individuals. At approximately 2:07 pm, a telephone call was intercepted between Leon-Moya and the individual who was later identified as Ivan Lujan, in which the agreed to meet in approximately one hour back at the hotel in Conway.

50.     Leon-Moya was observed leaving the Catalan residence, then he traveled back to the hotel in Conway, Arkansas, where he had met with the driver of the Ram pickup truck at approximately 1:40 am earlier that day. Leon-Moya entered room 233, which remained under surveillance. At approximately 4:16 pm, investigators observed the driver of the Ram pickup truck leave room 233, get into the Ram pickup truck, and drive east towards Little Rock. At Little Rock, the Ram pickup truck turned south on I-30 as if traveling towards Texarkana. At 5:20 pm, the Arkansas State Police conducted a traffic stop on the Ram pickup truck and the driver was determined to be Ivan Lujan at that time. Lujan granted consent to search the vehicle and $29,400 in cash was located in the center console. When asked about the money, Lujan stated that the money was intended to pay for a semi-truck and trailer he was interested in purchasing for his business. Noticeably absent from the vehicle were the two duffel bags investigators observed Lujan carry into the hotel earlier that day. While the $29,400 was seized as part of an administrative asset

forfeiture, Lujan was allowed to leave the area in his Ram pickup truck.

51.     At approximately 11:47 pm, a telephone call was intercepted between Leon-Moya and Lujan, in which Lujan told Leon-Moya "they took the papers." Lujan also told Leon-Moya "I told them the papers were to pay for a truck and trailer." They two also discussed whether or not "the dude would understand" and discussed Lujan changing the license plates on his truck and obtaining a new telephone. Indeed, the following day, November 2, 2021, at approximately 6:30 pm a telephone call was intercepted between Lujan and Leon-Moya in which Lujan informed Leon-Moya that the number he was calling from was his new telephone number.

52.     I believe based upon my training, experience, and knowledge of this and similar investigations that the series of events relayed above on October 31, 2021 and November 1, 2021 represent Leon-Moya obtaining a load of methamphetamine from his supplier "Vibora" via Ivan Lujan, who acted as a courier. I believe that the two duffel bags carried by Lujan in the early hours of November 1, 2021, but absent from Lujan's vehicle when searched, likely contained methamphetamine. I believe Leon-Moya made a trip to Clarksville on November 1, 2021 to both deliver the methamphetamine to Catalan for distribution by individuals such as Joel Wood and Juan Carrillo and to collect cash from methamphetamine sales from Catalan so that the cash could in turn be provided to Lujan to return to the Texas-Mexico border, where it would eventually be provided to "Vibora".

53.     On March 22, 2022, the undercover DEA agent made contact with Juan Carrillo by telephone for the first time since the last controlled transaction between them on April 22, 2021. In their recorded conversation, Carrillo confirmed that he was still in the business of selling methamphetamine and quoted the undercover agent a price of $450 for one ounce of methamphetamine and $850 for two ounces of methamphetamine. Carrillo also told the undercover

DEA agent, "if you buy more, I'll give you a better price." The undercover agent inquired above the availability of cocaine, and Carrillo stated that he could get cocaine in small amounts, but that it was very expensive.

54.     Affiant has continued to investigate Nectali Catalan's use of the InterCambio Express money remittance service, specifically as it relates to the transfer of funds to "Pedro Vallejo Rivera" of Guadalajara, Mexico, whom I believe to likely be "Vibora," as detailed above. On April 21, 2022, Affiant received a subpoena return from InterCambio Express. This return detailed regular wire transfers of money in a similar manner to that which occurred on September 19, 2021, described above. Specifically, the following transactions were conducted between Catalan and Rivera:

a)     $1000 from Catalan to Rivera on 10/14/21

b)     $1000 from Catalan to Rivera on 11/17/21

c)     $1000 from Catalan to Rivera on 12/16/21

d)     $1000 from Catalan to Rivera on 4/20/22

55.     Affiant has also continued to monitor the use of the telephones utilized by the members of this DTO. Although the DEA is not currently intercepting telephone calls from any of the members of the DTO, the toll records for each of their telephones indicates that they all remain in regular contact with one another. With the exception of one of Nectali Catalan's two telephones, all members of the DTO continue to utilize the same telephone numbers they utilized when intercepted pursuant to court-authorized interceptions conducted from June 1, 2021 through November 25, 2021. The following individuals use the same telephone numbers they used in the summer and fall of 2021:

Victor Leon-Moya:     479-774-2602 & 479-841-8649

| | |
|---|---|
| Juan Carrillo: | 479-774-0680 |
| Joel Wood: | 479-979-4540 |
| Jorge Villegas: | 479-317-0235 |
| Nectali Catalan | 479-774-8367 |

56.     Nectali Catalan ceased use of 479-979-5190 on or about March 22, 2022 and replaced it with telephone number 479-214-0538. To determine the new telephone number for Nectali Catalan, I examined the telephone tolls for DTO members Jorge Villegas, Joel Wood, and Juan Carrillo and determined that they were all in contact with 479-214-0538. Thus, I believe that Nectali Catalan is the user of 479-214-0538.

57.     Between March 22, 2022, the date of the undercover DEA agent's telephone conversation with Juan Carillo regarding methamphetamine and cocaine availability, and April 20, 2022, the toll records for the telephones associated with the DTO members listed in the preceding paragraphs reveal the following:

a) Catalan and Leon-Moya have exchanged 104 communications, with the most recent occurring on April 19, 2022

b) Catalan and Villegas have exchanged 161 communications, with the most recent occurring on April 19, 2022

c) Catalan and Joel Wood have exchanged 7 communications, with the most recent occurring on March 27, 2022

d) Leon-Moya and Villegas have exchanged 4 communications, with the most recent occurring on March 27, 2022

e) Joel Wood and Carrillo have exchanged 64 communications, with the most recent occurring on April 19, 2022

f) Catalan and Carrillo have exchanged 18 communications, with the most recent occurring on April 20, 2022

g) Villegas and Joel Wood have exchanged 3 communications, with the most recent occurring on March 25, 2022

Based upon this telephone toll analysis, coupled with the recorded communication between the undercover DEA agent and Juan Carrillo on March 22, 2022, and the recent transfers of money by Catalan to "Vibora" through InterCambio Express, I believe that the DTO continues to operate in the same manner as it operated while subject to court-authorized wire and electronic interceptions in the summer and fall of last year. Specifically, I believe Leon-Moya continues to obtain methamphetamine from "Vibora" in Mexico, then Leon-Moya depends on Nectali Catalan to manage the day-to-day distribution activities for the DTO. To accomplish this, Catalan relies on Joel Wood and Juan Carrillo to sell methamphetamine, and Jorge Villegas to deliver methamphetamine to the sellers, collect money, and deliver the money to Catalan, who in turn provides the money to Leon-Moya for remittance to "Vibora" in Mexico.

58.     On April 22, 2022, an investigator with the 5th Judicial District Drug Task Force interviewed an individual in the Franklin County Jail who will be referenced herein as Source of Information I (SOI1). SOI1 agreed to provide information regarding the investigation in exchange for consideration on their State of Arkansas charges which are unrelated to this investigation. SOI1's information has been largely corroborated through the investigation over the past two years, much of which is relayed in the paragraphs above. As such, I believe that SOI1's information can be trusted as true and accurate. SOI1 reported that he/she was a seller of methamphetamine and his suppler of methamphetamine was Joel Wood, who in turn was supplied by "a Mexican named Juan." SOI1 added that Joel Wood had bragged to SOI1 that he (Joel Wood) "had sold 126 pounds of dope in the last year." This recent statement from SOI1 further reinforces my belief that the DTO continues to operate in the same manner in which it operated in the summer and fall of 2021.

59.     On April 25, 2022, Affiant applied for and received a search warrant to search the residence of Nectali Catalan on Cherokee Lane in Clarksville in WDAR case number 2:22 CM 36.

This warrant was executed in the afternoon hours of April 25, 2022, and inside the Catalan residence approximately 200 suspected fentanyl pills, documents regarding wire transfers of money, notes appearing to be drug sales ledgers and $17,444 of United States Currency were located, reinforcing my belief that the DTO continues to operate in the same manner as it did in the summer and fall of 2021.

60.     Likewise, later in the day on April 25, 2022, a search warrant issued in Western District of Arkansas case number 2:22 CM 37 was executed on the Villegas property in Clarksville, Arkansas. Inside the residence, approximately two (2) kilograms of a substance believed to be cocaine was located.  This further reinforces my belief that the DTO continues to operate in the same manner as if did in the summer and fall of 2021.

### Further Statement of Probable Cause

61.     On April 20, 2022 a Federal Grand Jury seated in the Western District of Arkansas issued a True Bill Indictment for **Victor Leon-Moya, Juan Carrillo, Nectali Catalan aka "Miguel," Joel Wood, Ryan Wood, Jorge Villegas, Ivan Lujan** and others based on their participation in a drug conspiracy and other narcotics crimes in violation of Title 21, USC § 841(a)(1) and 846; and money laundering in violation of Title 18, USC § 1956 in Western District of Arkansas Case No. 2:22 CR 20008-001-012 (sealed).  Based on this indictment, indictment arrest warrants have been issued and are currently active commanding the arrests of Joel Wood, Ryan Wood, and others.  Leon-Moya, Catalan, Carrillo and Villegas were arrested on April 26, 2022.

### Justification for a "No-Knock" Search Warrant

62.     This application seeks a search warrant that does not require law enforcement to knock and announce their presence.  Several justifications exist for a search warrant which dispenses with the "knock and announce" requirement, which will be detailed in this section.

### a) Physical characteristics of the subject property and nature and characteristics of Joel and Ryan Wood

The subject property is on a tract of land of approximately twenty (20) acres in rural Johnson County, Arkansas.  The subject property contains two mobile homes, one where Joel Wood resides and one where Ryan Wood resides.  The subject property also contains multiple outbuildings, one of which has a makeshift tower built onto it, several vehicles in working and non-working condition, pieces of farm and heavy equipment, and piles of junk and trash.  The subject property is extremely rural, containing a gravel and dirt driveway near the intersection of Johnson County Roads 3201 and 3171.  The gravel and dirt driveway is the only point of entrance and exit from the property, and it heads downhill, with several of the structures on the property being situated at the bottom of a hill in a small valley. Joel and Ryan's mobile homes sit on top of a hill on the other side of the valley giving them a point of elevation overlooking the valley. As such, it is nearly impossible for any vehicle to enter the property without the notice of the residents. The entirety of the property, with the exception of the driveway opening, is completely surrounded by large trees and the two mobile homes sit in a clearing of the trees approximately 400 feet off of Johnson County Road 3201. In the late fall and winter it was possible to observe both of the residences on the property from County Road 3201 in a drive by manner; however, now in the spring the foliage on the trees has begun to grow, making the view of the residences from the public roads obscured, making surveillance of these structures prior to entering the property virtually impossible.

On September 30, 2021, Affiant interviewed an individual who will be referenced herein as Source of Information 2 (SOI2). SOI2 was interviewed as part of the investigation and is receiving no consideration for their information. SOI2's information has been corroborated largely by the investigation which occurred over the last two years, in particular the controlled

purchases of methamphetamine from Joel Wood, surveillance of Joel and Ryan Wood, and intercepted communications involving Joel and Ryan Wood, many of which are quoted herein. As such, I believe that SOI2's information can be trusted as truthful and accurate. SOI2 reported that they had been present on the subject property continuously from approximately July 5, 2021 through the first week of September, 2021. SOI2 reported that both Joel and Ryan Wood were engaged in the selling of methamphetamine and that they kept methamphetamine in various locations on the subject property. Regarding the shop building with the makeshift tower on the subject property, SOI2 stated that the Woods referred to this as a "crow's nest or owl's nest" and that the "crow's nest" contained three (3) high powered rifles with night-vision capabilities and that the Woods intended to use these rifles to protect the subject property from intruders. SOI2 also described an AK-47 style rifle that Joel Wood kept accessible on the property and made ready any time any individual arrived on the property whom Joel Wood did not know. In addition, SOI2 indicated that the Woods had cut what they described as "shooting lanes" so that an individual in the "crow's nest" could have a clear line of fire to virtually any location on the subject property. SOI2 reported further that on several occasions, when an individual who was unknown or had unknown intentions entered the property, one of the Woods, to include Joel Wood's daughter Makayla Wood, would hide on the property in either one of the residences or in the "crow's nest" and keep a firearm pointed at the individual entering the property.

SOI2 also reported that the Woods had a local law enforcement source which could provide them with information regarding investigations and informants against them. SOI2 reported that they had been present when Ryan Wood had called the law enforcement source, who would run NCIC/ACIC inquiries for the Woods. Specifically, SOI2 reported on an instance they witnessed when Ryan Wood called their law enforcement source and inquired about an

individual with whom they had sold methamphetamine, and their law enforcement source reported to them that the individual under inquiry was an informant. To this, SOI2 reported that Ryan Wood stated that if that individual returned to the property "it was going to be done for them. I'll hit them in the head with a pipe and it will be done. We'll put her in the back pasture." SOI2 took this to mean that the Woods would murder this individual and hide the body in the back pasture of the subject property if that individual returned to the subject property.

SOI2 also reported that the Woods would impersonate law enforcement officers to maintain security on the subject property. SOI2 reported of two occasions when vehicles were on the subject property's road and because Joel and Ryan Wood were suspicious they would put on Kevlar vests and stolen law enforcement badges, then make contact with the motorists to inquire as to why they were in the area. SOI2 reported that Joel and Ryan Wood told them that if the motorists answered wrong, "they would be shot."

### b) Potential for the presence of weapons on the subject property

Both Joel and Ryan Wood have been in possession of firearms at various points of the investigation. As relayed previously, when Ryan Wood was encountered by law enforcement on November 13, 2020, he was in possession of three pistols and an AR-15 rifle when stopped by the Johnson County Sheriff's Office for suspected DWI. In addition, at the time of this traffic stop, Ryan Wood was wearing an empty firearm holster, which presumably held one of the three pistols found in his vehicle at the time of the search, indicating the potential for Ryan Wood to be carrying a firearm on his person at any juncture.

An intercepted telephone call between Juan Carrillo and Joel Wood on June 1, 2021 at approximately 6:14 pm indicated that the subject property likely houses many firearms as well. In this call, the following dialogue occurs:

Juan Carrillo (JC):    I'm going to bring you 50 to 60 rifles for you to keep. 100 to 80 guns altogether.

Joel Wood (JW):    You going to get my entire family? (laughs)

JC:    I'm going to get your mom, dad and brothers.    (laughs)

JW:    I have over 200 guns at my house.

JC:    I am going to bring you 50-60 rifles and about 40 guns.

JW:    Call to remind me, because I will forget.

JC:    Throw me 8 more for the business.

JW:    I'll take care of you.

I believe based upon this exchange that it is likely that the subject property contains many firearms, both rifles and pistols. I further believe it likely based upon this exchange that Carrillo and Joel Wood are trafficking firearms, based upon Carrillo's request for "8" as a result of bringing the firearms to the subject property and Joel Wood's agreement to "take care of" Carrillo.

Despite with multiple firearms being seized from Ryan Wood on November 13, 2020, Ryan Wood appears to have acquired another AR-15 rifle by June 6, 2021. On June 6, 2021 at approximately 7:49 pm, a telephone call was intercepted between Ryan Wood and Juan Carrillo. In this telephone call, Ryan Wood noted that he "needed to sell his gun," adding that it is "an AR," which I believe to be a reference to an AR-15-style rifle.

Like Ryan Wood, Joel Wood has also been discovered to be in possession of a firearm during a traffic stop which occurred during this investigation. On October 22, 2021 at approximately 3 pm, a deputy with the Logan County Sheriff's Office pulled over a pickup truck for suspicious activity and determined the driver of the pickup truck to be Joel Wood. The truck contained two additional occupants, one of which was Juan Carrillo. Joel Wood consented to a

search of his pickup truck, and inside the driver's side door pocket a pistol was located. Joel Wood admitted to ownership of the pistol. Because Joel Wood was not legally prohibited from possessing a firearm, and the investigative stop by the Logan County Sheriff's Office revealed no violations for which an arrest could be effectuated, Joel Wood was allowed to retain the firearm and continue in his travels.

### c) Potential that Joel and Ryan Wood are aware that they are under law enforcement investigation

Throughout the investigation, nearly all members of the DTO, including Joel and Ryan Wood, have conducted countersurveillance and are acutely aware of the presence of law enforcement near their location. For example, on June 2, 2021, a telephone call was intercepted at approximately 9:38 pm between Ryan Wood and Juan Carrillo in which Ryan Wood and Juan Carrillo discuss a place to meet to conduct a methamphetamine transaction. In this conversation, they discuss meeting "at the exit;" however, Ryan Wood points out "the exit is dangerous now because of cops."

Joel Wood also notes his own countersurveillance when talking with Juan Carrillo. For example, on June 6, 2021 at approximately 12:47 pm, a telephone call was intercepted between Juan Carrillo and Joel Wood in which they discussed Wood potentially being under surveillance. Joel Wood, who was located at the subject property at the time of the call, commented "I got the damn DEA over here sitting across the road watching me." To this, Carrillo expressed concern, and Joel Wood added "yesterday there was like three cops, see at night like three cops, one cop passed twice. I don't know!" At this point of the investigation, the DEA was not conducting surveillance at the subject property, thus highlighting Joel Wood's extremely heightened awareness of the vehicles which are around the subject property.

Similarly, eight days later another call between Carrillo and Joel Wood of this nature was intercepted on June 14, 2021 at approximately 4:14 pm. In this call, Carrillo inquires as to why Joel Wood did not visit Carrillo at the Carrillo property the previous evening, to which Joel Wood replied: "I had the cops in my yard last night when I walked outside of my house." Regarding this, Joel Wood and Juan Carrillo discuss their being an increased police presence in the area of late, and they caution each other to be very careful with their movements.

Similarly, on June 21, 2021, at approximately 11:56 am, in an intercepted conversation between Joel Wood and Juan Carrillo, Joel Wood references his fear that he is under surveillance, specifically stating "I'm looking like federally indicted in a court. That's what I heard." Later, as it relates to the subject property, Joel Wood stated "I heard they are gonna raid me and stuff, I heard but I don't know." Joel Wood later added "they have to have a warrant when they pull up...they got, they got to show me that warrant...but they can't back in on my property until they show me that damn warrant."

Joel Wood's consistent countersurveillance around the subject property continued throughout the investigation, with a text message intercepted between Joel Wood and Nectali Catalan on August 11, 2021 at approximately 9:01 pm. The text message read: "Just letting you know dea k 9 unit was settiiing my yard when I pulled back upso.ething is going on thT shit doesn't just happen said he was looking g for someone I told them didn't live here so I seet him on his way but he was recouping everything. [sic]" As discussed above, I was conducting surveillance in the area of August 11, 2021; and I operate an SUV which is also commonly used for K-9 operators. However, on August 11, 2021 I did not make contact with Joel Wood, leading me to believe that Joel Wood is either embellishing his countersurveillance to Catalan so that Catalan does not become concerned; or Joel Wood encountered another law enforcement vehicle

that evening of which I am not aware. In either instance, this exchange further highlights the high level of scrutiny Joel Wood places on individuals and vehicles which are present at or near the subject property.

63.    I believe that it is likely that Joel and Ryan Wood likely possess a number of weapons which will likely be present when law enforcement enters the property to execute the arrest warrants for Joel and Ryan Wood and this search warrant, if approved by the Court. With the presence of weapons, and the physical nature of the subject property, to include its isolation and the presence of shooting lanes and a "crow's nest," coupled with the likelihood that Joel and Ryan Wood likely are aware of the investigation against them and/or the Indictment, I believe that a search warrant which dispenses with the knock and announce requirement would be prudent for several reasons. First and foremost, the safety of the law enforcement officers executing the warrant is paramount, and doing away with the knock and announce requirement will help to ensure the safety of law enforcement who enter the subject property.  In addition, with the paranoia that Joel and Ryan Wood have demonstrated regarding countersurveillance as it relates to their property, the less notice that Joel and Ryan Wood receive that law enforcement is on the property, the less likely it is that the Woods will flee or destroy evidence which may be present on the subject property. Based upon all these factors, I believe a search warrant which dispenses with the "knock and announce" requirement is necessary.

## CONCLUSION

64.     Based on the foregoing, I believe there is probable cause to search the **Subject Premises,** described in **Attachment A** for the items described in **Attachment B**, which constitute evidence of a crime, contraband, fruits of crime, items illegally possessed, and property designed for use, intended for use, or used to commit a crime, concerning violations of Title 21, United States Code, Sections 841(a)(1) and 846; and violations of Title 18, United States Code, Sections 1956 and 1957.


ANDREW CHRONISTER   Digitally signed by ANDREW CHRONISTER
                    Date: 2022.05.04 09:45:47 05'00'

Andrew Chronister
Special Agent
Drug Enforcement Administration
Fort Smith, Arkansas


Subscribed and sworn to before me this ____4____ day of ~~April~~ May, 2022.


Hon. Mark E. Ford
U.S. Magistrate Judge